Christine M. TOWNSEND

v.

MAINE BUREAU OF PUBLIC SAFETY.

Supreme Judicial Court of Maine.

Aug. 23, 1979.

Harry N. Starbranch (orally), Augusta, for plaintiff.

Charles D. Devoe, Asst. Atty. Gen. (orally), Augusta, for defendant.

Before McKUSICK, C. J., and POMEROY, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

DELAHANTY, Justice.

We here confront the complex and sensitive issue of whether and under what circumstances a gradual mental injury will be compensable under the Workers' Compensation Act (Act), 39 M.R.S.A. § 1 *et seq.* By a decree dated July 11, 1978, the Workers' Compensation Commission (Commission) awarded three months of total compensation to Christine M. Townsend for mental anxiety requiring hospitalization which was allegedly caused by day-to-day employment

pressures. We sustain the appeal of the claimant's employer, Maine Bureau of Public Safety (Bureau), brought to us from a pro-forma decree of the Superior Court, Knox County, and remand the case for further proceedings.

Christine Townsend was employed as a civilian dispatcher with the Department of Public Safety from June of 1973 until March of 1976. After being reprimanded by her supervisor on March 18, 1976, for an infraction of the Department's rules, Ms. Townsend became emotionally distraught and left work early that day. Suffering from what the claimant described as a "nervous breakdown," she thereafter voluntarily entered Brunswick's Regional Memorial Hospital where she remained for approximately four weeks. Dr. Frank Sheldon, a physician, testified on Ms. Townsend's behalf. It was his opinion that she had been suffering from a "situational reaction" with a modest depression. Dr. Carlyle Voss, a psychiatrist testifying for the claimant, characterized her condition during this time frame as a definite depression of a moderate degree requiring hospitalization. The Commissioner made a like finding which is not challenged by the Bureau.

At the heart of this appeal is the question of whether Ms. Townsend's disability arose out of and in the course of employment. 39 M.R.S.A. § 51. The claimant testified that she was subjected to work-related "harassment" beginning in the winter of 1973 due to a relationship she had with a state police officer which the Department attempted to discourage. She related a series of incidents in which she was followed, received annoying telephone calls, and was summoned to court, all perpetrated by Department employees who were out to get her. Ms. Townsend stated that even after the relationship ended she was exposed to repeated disciplinary hearings and suspensions which were unjustified until she was no longer able to cope with her job.

Captain Graves, Ms. Townsend's supervisor, discounted any possibility of official harassment. He further testified that when she was not moody and depressed she was an excellent employee. However, her personnel file, which was introduced into evidence, showed a pattern of minor insubordination for which Ms. Townsend was frequently reprimanded.

Dr. Sheldon testified that the "situational aspect" of her employment "[had] something to do with [her disability]", but he stated that he could not determine whether it was a major or minor part.

Dr. Voss' testimony formed the basis for much of the Commissioner's decree.[1] He stated that the claimant had an aggressive-defensive personality which predisposed her to come into conflict with her fellow employees. She was also predisposed to depression under stressful situations. Factors unrelated to her employment, such as her divorce and tension with members of her family, played a significant role in her breakdown. The Commissioner adopted these determinations in his decree.

His testimony regarding the connection between Ms. Townsend's employment and her disability was ambiguous. At one point, he testified that the demands of the work produced no difficulty for the claimant. At another point, he stated that "serious conflicts in her work situation played a significant role in her becoming depressed." Further ambiguity was created when he testified first that Ms. Townsend's injuries could have occurred in any working situation. Shortly thereafter he stated, however, that the authoritative environment of the Department, in which Ms. Townsend was the first woman to serve, made her breakdown more likely to occur. Without extensive discussion, the Commissioner concluded that the cause of Ms. Townsend's

---

1. The Commissioner in his decree stated that because the employer objected to Voss' testimony he was not considering it. We are at a loss to understand this comment both because of his verbatim adoption of part of the psychiatrist's testimony and because the employer never objected either at the hearing or on appeal to this witness.

disability was sufficiently work related to warrant compensation.[2]

Recognizing that the Commissioner's findings of fact are final when supported by competent evidence, *Grant v. Georgia-Pacific Corp.,* Me., 394 A.2d 289 (1978), the Bureau apparently argues that when compensation is claimed for a mental disability the evidence must show a particular work-related event as a cause of the injury. This contention requires an examination of our relevant case law.

■ It is clear that this Court has never found talismanic the physical-mental dichotomy for purposes of our workers' compensation law. For at least half a century we have recognized that mental injuries resulting from physical trauma may be compensable. *Baker's Case,* 143 Me. 103, 55 A.2d 780 (1947); *Reynold's Case,* 128 Me. 73, 145 A. 455 (1929) ("cerebral congestion" caused by fall compensable); *see* Annot., 86 A.L.R. 961 (1933).[3] Conversely, mental stimulus such as fright, undue anxiety, and mental strain and stress leading to a physical injury fall within the purview of our Act. *Turner v. Kennebec River Pulp & Paper Co.,* Me., 359 A.2d 304 (1976) (compensation awarded where emotional stress of job, in part, caused fatal myocardial infarction); *see* 1B A. Larson, The Law of Workmen's Compensation § 42.21 (1979).

If both physical trauma leading to mental injury and mental stimulus leading to physical injury would be compensable, it would follow that mental stimulus leading to mental injury would come within the reach of our Act. Indeed, in *McLaren v. Webber Hospital Association,* Me., 386 A.2d 734 (1978), we recognized just such a result. There a compensation award was upheld where the claimant suffered an acute schizophrenic episode as a result of a job-related sensitivity seminar he attended.

We have also had occasion to discuss the distinction between gradual and sudden injuries. Until recently, our Act referred to a "personal injury *by accident.*" 39 M.R.S.A. § 51 (1964). (emphasis supplied). The "accident" limitation was viewed, in general, as requiring an unexpected or sudden occurrence. *Towle v. Department of Transportation, State Highway,* Me., 318 A.2d 71, 73 (1974). Thus, in *Towle,* a gradually resulting work-related back strain was held non-compensable by a majority of the Court on the strength of prior Maine precedent. In the interim, the Legislature amended the Act by deleting the accident requirement. The amendment had the effect of avoiding harsh results of cases such as *Towle. Canning v. State Department of Transportation,* Me., 347 A.2d 605, 607 (1975). In *Canning,* we stated that "[the] attempt to liberalize the Act [to compensate employees for injuries suffered while and because they were at work] could be achieved fully only by excising the accident standard from the entire Act." *Id.* at 608.

In *Ross v. Oxford Paper Co.,* Me., 363 A.2d 712 (1976), the claimant, a roll handler at a paper mill, suffered numbness in his hands cumulatively caused by repeated

2. In his decree, the Commissioner stated:

 The history of disciplinary suspensions and hearings, some ultimately justified and some not, her problems about taking time off for sometimes good reasons and sometimes not, all played a part in her ultimate hospitalization and a part which is substantial enough to [justify] a finding favorable to the employee in this case.

 It also *remains a constant factor in the equation* throughout that she was the first woman to serve as a member of the Maine State Police, which was a novel situation, and under the circumstances the qualities which she brought to the job, not unnaturally led to some of these conflicts.

3. In *Reynold's Case, supra* at 74, 145 A. at 456, the Court stated:

 Mental disability, if a sequence as the effect of injury to a great nerve center, received in the course of his employment and arising out of it, is compensable.

 No citations of authorities are needed; from complete paralysis, or coma, down through the grades of disability that lessen an operative's capacity to do the work of his employment, mental inefficiency is to be considered in appraising the economic value of a man.

trauma to them. Although this gradual injury would have been non-compensable prior to the modification of the statute, under the Act as amended it was plainly compensable.

Combining the holding of *Ross* with the principle implicitly recognized in *McLaren,* we are led to the ineluctable conclusion that gradual mental injuries are not per se excluded from the reach of the Act. Indeed, citing *Ross* and *McLaren,* we recently stated in dicta: "We perceive no reason why in appropriate circumstances [a gradual mental] injury is not fully compensable if in fact it is shown that the injury arose out of and in the course of employment." *Murray v. T. W. Dick Co.,* Me., 398 A.2d 390, 392 (1979).

An underpinning of policy considerations also supports this conclusion. If we were to cordon off gradual mental injuries from the Act's purview, the Commission and ultimately this Court would be forced to decide whether in a given instance a disability was a non-compensable gradual mental injury or a compensable gradual physical injury. This is a distinction without a difference, for under contemporary medical theory mind and body comprise a single, complex, and integrated unit. As expressed in 1B A. Larson, *supra* at § 42.23(a),

> there is no really valid distinction between physical and "nervous" injury. Certainly modern medical opinion would support this view, and insist that it is no longer realistic to draw a line between what is "nervous" and what is "physical." It is an old story, in the history of the law, to observe legal theory constantly adapting itself to accommodate new advances and knowledge in medical theory. Perhaps, in earlier years, when much less was known about mental and nervous injuries and their relation to "physical" symptoms and behavior, there was an excuse, on grounds of evidentiary difficulties, for ruling out recoveries based on such injuries, both in torts and workmen's compensation law. But the excuse no longer exists.

It would be equally unacceptable, even if possible, to distinguish between non-compensable gradual mental injuries and compensable sudden mental injuries given the legislative jettisoning of the accident limitation. Moreover, it would deny coverage to an entire class of individuals injured just as surely as if a sudden and unexpected occurrence had befallen them.

■ We hold that gradual mental injuries are within the umbrella of the Act. We must now consider what, if any, limitations are to be placed upon the compensability of such injuries.

In approaching this issue, we are guided by a number of distinct principles. We recognize that the Act serves the benevolent purpose of protecting employees against risks which are created by and are incidental to employment. *Brown v. Palmer Construction Co.,* Me., 295 A.2d 263 (1972). A liberal interpretation of the Act is therefore mandated, 39 M.R.S.A. § 92, to avoid harsh or incongruous results and to ensure that all employees who have received industrial injuries will be protected. *Gilbert v. Maheux,* Me., 391 A.2d 1203 (1978).

At the same time, the Court has always proceeded cautiously when dealing with mental injuries because of the great danger of malingering. For years the tort rule had been that there could be no recovery where the defendant's negligence produced mental suffering unaccompanied by any physical impact or injury. *Herrick v. Evening Express Publishing Co.,* 120 Me. 138, 113 A. 16 (1921). In requiring some associated physical impact, the *Herrick* Court sought to introduce a test of reliability into an area where the law would otherwise be ill equipped to ferret out the legitimate claims from the fictitious and speculative ones. The physical impact requirement was abandoned in *Wallace v. Coca-Cola Bottling Plants, Inc.,* Me., 269 A.2d 117 (1970). However, still concerned about false and fancied suits, and as a hedge against them, *Wallace* imposed the requirement that the

mental and emotional suffering be "substantial and manifested by objective symptomatology." *Id.* at 121.

More recently, we recognized an independent action for the intentional infliction of emotional distress. *Vicnire v. Ford Motor Credit Co.,* Me., 401 A.2d 148 (1979). Although in *Vicnire* we did not incorporate *Wallace's* "objective symptomatology" standard, as applied to the negligent infliction of mental and emotional distress, by requiring the plaintiff to prove (1) that he suffered "severe" emotional distress, (2) that the defendant's conduct was "so 'extreme and outrageous' as to exceed 'all possible bounds of decency' and must be regarded as 'atrocious, and utterly intolerable in a civilized community,'" *id.* at 154, *quoting* Restatement (Second) of Torts § 46, Comment d, and (3) that "the emotional distress suffered" was such "that 'no reasonable man could be expected to endure it,'" *id.* at 154, *quoting* Restatement (Second), *supra* at Comment j, we sought to provide adequate assurance that the mental distress was not feigned. *See* Restatement (Second), *supra* at Comment k.

The danger of illusory and fictional claims is as real and present in workers' compensation as it is in the law of torts. Where a mental injury occurs rapidly and can be readily traced to a specific event, as in *McLaren,* there is a sufficient badge of reliability to assuage the Court's apprehension. Where, however, a mental injury develops gradually and is linked to no particular incident, the risk of groundless claims looms large indeed.

There is an additional factor which causes us concern. We are here dealing with what may broadly be referred to as a neurosis or psychoneurosis which has been defined as a

functional mental disorder marked by fears and anxieties and in which there is a minimal loss of contact with reality. 2 J. Schmidt, Attorneys' Dictionary of Medicine 247–48 (1978). It may be that the neurosis encountered by an adult stems from a trauma experienced in early childhood. 3B R. Gray, Attorneys' Textbook of Medicine §§ 104.01(1), 104.02(4) (3rd ed. 1979). It could also be the result of emotional jolts from various quarters. *See id.* at § 104.67.[4] In such cases, singling out any individual stimulus as *the* cause of the neurosis would be a difficult, if not impossible, task. In evaluating this kind of dilemma, one student commentator has aptly observed:

> Whether a given experience or combination of experiences will trigger the psychoneurotic potential into a psychoneurosis will depend on the vulnerability of the individual and the nature and duration of the stresses bearing upon him. *In such cases, the causation requirement [in workers' compensation law] is of little assistance in deciding whether to award compensation. Some causal connection with an employment event can probably be established in most cases, but since a constellation of factors is at work, it is frequently impossible to determine the causal significance of any one factor.* Note, *Workmen's Compensation Awards for Psychoneurotic Reactions,* 70 Yale L.J. 1129, 1143 (1961). (emphasis supplied).

Were we simply to require "a causal connection" between the conditions of employment and the resulting disability, *Oliver v. Wyandotte Industries Corp.,* Me., 360 A.2d 144, 147 (1976), virtually every psychoneurotic injury would be compensable. The spirit of the Act simply does not extend

---

4. Thus, Gray gives us the fascinating example of the man whose general insecurity was compounded with the threatened destruction of his marriage, family, professional standing, and employment. A severe and disabling neurosis was precipitated by a relatively minor event: a light shower of ceiling plaster fragments fell on the man's head. *Id.* at § 104.54(1).

This relatively minor occurrence (from an outside viewpoint) had far greater significance to him, however, since it seemed to him to be the culmination of a long series of blows and mishaps. For him it became symbolically an instance of "the roof finally caving in" on him.

that far. Its purpose is to protect workers from those injuries which "in a just sense" relate to employment. *Barrett v. Herbert Engineering Inc.,* Me., 371 A.2d 633, 636 (1977). It was never contemplated that an employer would become a general health and accident insurer.

Any rule which we formulate for gradual mental injuries must therefore be able to navigate between the beacon of a progressive Act and the shoals of potentially fraudulent claims coupled with the specter of the employer as a universal insurer. With these competing goals in mind, we turn to the relevant case law.

Some courts would apparently compensate a gradual mental injury resulting from ordinary day-to-day work-connected emotional pressure using the same criteria that they would to evaluate any other injury. *Baker v. Workmen's Compensation Appeals Board,* 18 Cal.App.3d 852, 96 Cal.Rptr. 279 (1971); *Royal State National Insurance Co. v. Labor and Industrial Relations Appeals Board,* 53 Haw. 32, 487 P.2d 278 (1971); *Carter v. General Motors Corp.,* 361 Mich. 577, 106 N.W.2d 105 (1960); *see Deziel v. Difco Laboratories Inc.,* 394 Mich. 466, 232 N.W.2d 146 (1975) (job-related aggravation of pre-existing mental disorder). On the other hand, Massachusetts apparently does not recognize gradual mental injuries. To date, the Commonwealth, under its wear and tear doctrine, requires proof of specific, stressful, work-related incidents occurring over a relatively short time period. *Albanese's Case,* 389 N.E.2d 83 (Mass.1979); *Fitzgibbon's Case,* 373 N.E.2d 1174 (Mass. 1978). Given our foregoing analysis, we find both of these views unacceptable. *See* 1B A. Larson, *supra* at § 42.23(b), criticizing the latter approach.

Other courts fall somewhere between these two extremes. *Compare Victoriana v. Orleans Parish School Board,* 346 So.2d 271 (La.App.1977) (mental injury must be proven as any other injury but factfinder must proceed with utmost caution and exercise extreme care), *with Sloss v. Industrial Commission,* 121 Ariz. 10, 588 P.2d 303 (1978), *and Fireman's Fund Insurance Company v. Industrial Commission,* 119 Ariz. 51, 579 P.2d 555 (1978) (unexpected, unusual, or extraordinary stress required).

Larson has endorsed yet another approach. 1B A. Larson, *supra* at § 42.23(b). Under the Wisconsin rule, "the injury must have resulted from a situation of greater dimensions than the day-to-day mental stresses and tensions which all employees must experience." *School District # 1 v. Department of Industry, Labor & Human Relations,* 62 Wis.2d 370, 377–78, 215 N.W.2d 373, 377 (1974); *see Swiss Colony, Inc. v. Department of Industry, Labor & Human Relations,* 72 Wis.2d 46, 240 N.W.2d 128 (1976). We think this standard has much to commend it and accordingly adopt it. Requiring a higher threshold level than simply the usual and ordinary pressures that exist in any working situation would erect an appropriate buffer between the employer and a host of malingering claims. It would also serve to filter out a sufficient number of cases so that an employer would not be thrust into the role of a general insurer while permitting compensation in those gradual mental injury cases which "in a just sense" can be attributed to the conditions of employment.

While this rule would be appropriate in the vast majority of gradual mental injury cases, it would not compensate an individual who, for example, developed a psychological disability resulting from the simple day-to-day stresses of an assembly line—the psychological analogue of the *Ross* situation. *See Carter v. General Motors Corp., supra,* and Larson's implicit approval of the result. 1B A. Larson, *supra* at § 42.23(b). Our Act, however, is not merely objective covering the average person; it is also subjective and protects even the eggshell. With adequate safeguards to shield the employer, even those predisposed to mental injury should be able to recover for ordinary work-related stress to which others would not succumb. We conclude that ordi-

nary work-related stress and strain could be compensable if it were shown by clear and convincing evidence that the trauma generated by the employment predominated in producing the resulting injury.[5] Any less showing, however, would be insufficient adequately to protect an employer.

In sum, where there is a sudden mental injury precipitated by a work-related event, our typical workers' compensation rules will govern. *See McLaren v. Webber Hospital Association, supra.* Where, however, the mental disability is the gradual result of work-related stresses, the claimant will have to demonstrate either that he was subjected to greater pressures and tensions than those experienced by the average employee or, alternatively, by clear and convincing evidence show that the ordinary and usual work-related pressures predominated in producing the injury.

 Applying these standards to the case at bar, it is clear that Ms. Townsend's injury was not attributable to a particular *McLaren*esque event. The record lends some support, however, to the notion that the employee was exposed to an "unusual stress" as the first female employee of the Maine State Police. The record also suggests that the ordinary day-to-day stresses of her work environment contributed to her disability. Since the Commissioner did not have the benefit of the principles announced herein, we think it best to remand the case.[6] *Justard v. Oxford Paper Co.,* Me., 328 A.2d 127 (1974). Upon rehearing, both parties should be allowed, and indeed are encouraged, to introduce new testimony bearing on the relevant issues. Our disposition of her appeal leaves the employee free to demonstrate her entitlement to compensation by proving, *inter alia,* that

(1) under the Wisconsin standard her injury was the direct result of the unusual stress generated by her being the first woman on the Maine State Police, or

(2) the ordinary stress of her job was, by clear and convincing evidence, the predominant cause of her injury, or

(3) a combination of (1) and (2) was, by clear and convincing evidence, the predominant cause of her injury.

The entry is:

Appeal sustained.

Judgment of the Superior Court vacated.

Remanded to the Workers' Compensation Commission for further proceedings consistent with this opinion.

It is further ordered that the employer pay to the employee an allowance of $550 for her counsel fees plus her reasonable out-of-pocket expenses for this appeal.

WERNICK, J., did not sit.

**5.** For a discussion of the application of the "clear and convincing evidence" standard, *see Horner v. Flynn,* Me., 334 A.2d 194 (1975).

**6.** The issue decided here was not addressed in *Mortimer v. Harry C. Crooker & Sons, Inc.,* Me., 404 A.2d 228 (1979), because it was not a point on which that appeal was premised. However, it should be noted that the "trau-

matic neurosis and other nervous and psychiatric disability," *id.* at 229, suffered by Mortimer was alleged to be the direct product of a particular motor vehicle accident. The procedure on remand, as suggested in footnote 5 of *Mortimer, id.* at 231, is in no way inconsistent with the holding here announced.